for the appellate, Mr. Myers, for the appellee, Mr. Ellis, and Mr. Teplitz. Will you both be speaking? You've divided your time? Very good. You may proceed. May it please the court, counsel. I'm John Myers. I'm counsel to Macon County and the Macon County officials involved in this case. I was appointed special assistant to the state's attorney over there. I think the first important question in this case, there's something of a unique set of facts in this case, I believe. The question is, what happens in a TIF district when there's a piece of property, as here, where the use of the property has changed from exempt, religious, to non-exempt, before the TIF is formed, but the change in the exemption, or the revocation of the exemption, does not occur until, as it happens, the very day that the TIF ordinance is filed with the county, which is what happened here. That day, November 14, 2006, the assessor revoked the pre-existing exemption, and she revoked it retroactively to, I believe, June 1, 2006. The county clerk, when he is certifying the TIF base, is supposed to certify the most recently ascertained Equalized Success Evaluation. And on advice of one of the assistant state's attorneys over there, Ken Bowles, the clerk being here, because of the revocation of the exemption, he said, well, what am I supposed to do? What's the value here when the exemption has been revoked? And he went back and looked at the last time the property had been assessed, which was in 2004, and he used that number, and that number had been assessed value of the property. Let me ask you a question. Had the exemption occurred on the date that the church stopped using it? Had that been revoked on that date, before the TIF district ever came into existence, would we be here? I don't know. Well, I mean, you'd have to ask them. My best judgment is probably not. I understand that's not what happened. What I'm suggesting to the court, and this so often happens, this is a case of first impression, that under the law, it's not infrequent for there to be retroactive adjustments or changes or recognitions of error in Equalized Assessed Evaluations. You have the omitted property cases, and of course this is not an omitted property case. I've talked about those on pages 18 through 20 of my brief. And then you have the rollback cases, and the rollback cases say that sometimes you have to look at an earlier Equalized Assessed Evaluation in order to... I thought the rollback cases referred to vacant land. Yes. But that's not what we have here. That's true. And I'm not saying this is governed by the rollback statute. What I'm saying is the principle of the rollback cases is that you have under the TIF Act, the increment that goes to the city, then to the developer, has to be increment that's generated as a result of the development itself. Not some accident. Not some accident such as a tax exemption. What happened here, there actually was a contract for the developer to pay good money for this property. I forget what it was, maybe a million dollars. The developer had entered into a contract with the church to buy the church before the TIF was formed. And if you look at the redevelopment agreement that's in the exhibits, the redevelopment agreement recognizes the fact that there's this pre-existing contract. So what happened here is the developer in the city said, oh, what we'll do is the developer will buy this property when it loses its exemption. The developer will be entitled to this artificially generated increment that exists only because the exemption disappeared. Not because the developer has put bricks and mortar onto the property and fixed it up and increased its value. So the principle of the rollback cases is that you only get the increment that's generated by the development, not increment that would be generated, as here, by the loss of the exemption. Didn't they put money into this building? I believe they did. So if they put money into an existing building, it doesn't count? But if they put the same amount of money into building a building, it would? No, I'm not saying that. Well, isn't that the effect of your argument? Well, no, what I'm saying is this. The building, there's a contract here for the developer to buy the building for a million dollars, and the building is worth a million dollars, although it's exempt. If the developer now puts a half a million dollars into the building, the increment to which the developer is entitled is the taxes generated by the half million by the improvements to the building, not the increment that exists merely because of the exemption. Well, if that's the case, shouldn't the municipality that is deciding on the TIF arrangement make that clear when they're doing so? I'm sorry? Shouldn't the municipality which is coming up with this TIF idea and arrangement make that clear when doing so? Well, I think they should, yeah. That's not what happened here, though, is it? No, it isn't. And that's why the taxing districts or the county is here saying, hey, that's the way it should be done. There should not be this increment. Why don't we require, why shouldn't the law require the taxing authorities to adhere to the arrangements that they initially made, including if they want to say, hey, you're only going to get value beyond the value of the existing building, put that in the TIF district as opposed to come four years after the fact and complain to the court about save us from our own agreement? I don't have an answer to that. Well, but that's kind of the question here, isn't it? Well, the... If you don't have an answer, maybe that's because you should lose this case. Well, I'm not sure I understood the question. Okay. If the question is, if you're talking about the counterclaim that the county filed alleging the invalidity of the TIF, that's what you're talking about. In part, yes. If you're talking about whether that should be barred by laches, the answer to that one is that the county didn't realize until this case had been filed and went and got its own consultant that there was a problem with the validity of the TIF. If you're talking about agreements regarding the distribution of tax money, the county is not a part of that. That agreement is between the city and the developer. All the county does is, yeah, it sits on the Joint Review Board, but it's not a part of these agreements. So there's no agreement by which the county should be bound. In fact, the county, the Joint Review Board doesn't even look at the redevelopment agreement. It just looks at whether the TIF is valid or not. Well, isn't Mr. Bean, as the county clerk, involved initially in all of this? He was, yes, he was designated as the representative of the county on the Joint Review Board. The Joint Review Board is an advisory committee made up of certain taxing districts, not all the taxing districts, but many of the taxing districts, and they're charged by statute with looking at the validity of the TIF. But the reality is there's a presentation made by the city and the developer and the developer's consultant, and they listen to what is said, and they say, yeah, we agree with you. It looks like this is a valid TIF, or we don't agree with you. It's not a valid TIF, and if they don't agree, then the only thing that happens is there's a supermajority requirement when the city council goes to vote on the TIF. It has to pass by a three-fifths majority if the Joint Review Board has questioned it. What happened in this case? Well, in this case, the Joint Review Board recommended the TIF, and the city council of Decatur adopted the TIF by a 7-0 vote. So it's our contention that there's no problem, there's no reliance interest when you get seven votes. It's not like if there had been four votes, maybe there would be an argument. So there should be no consequence to the Joint Review Board recommending a TIF and then years later coming in and saying it's not a good idea? It's not the Joint Review Board that's saying that. It's the county that's saying that. And what the county is saying is we were given, the clerk dean was given a presentation, the Joint Review Board was given a presentation that said the TIF was valid, and now we find out that indeed the blighting factors were not present. This happens all the time. And the other cases where counties have challenged TIFs for invalidity and they've been held invalid by the courts, I'm the first to admit that in those cases there's typically a negative recommendation by the Joint Review Board. But the recommendation of the Joint Review Board is incidental to the standing of a unit of government affected by the TIF to challenge the TIF, because the Joint Review Board, like a plan commission in a zoning case, is strictly advisory. I mean, if a plan commission makes a negative recommendation in a zoning case, in some circumstances there can be a forcing a supermajority. But it's still advisory. It's not binding on anybody. So... Well, you identified an assistant state's attorney who after the fact came up and said there's a problem with all of this. Yes. And just a curiosity, shouldn't this person from the state's attorney's office, who's the legal counsel for the county clerk, be called upon when these stiff things are being presented to say there's a problem with it at that stage? I'm not going to argue with that. In principle, perhaps the assistant state's attorney should be there. But the fact of the matter is the assistant state's attorney wasn't there. The revocation of the exemption took place the same day the ordinance was filed, and the county clerk goes to him and says, hey, what do I do? There's been a revocation here.  What am I supposed to do? Is it zero when the property's not tax-exempt anymore? Or is it $400,000, or is it some other figure? And the state's attorney looked at the rollback cases and said, I think you need to use the preexisting equalized assessed valuation. If we accept your argument on the rollback cases, we'd be the first court to do so? Yes. Yes, you would. Because, in fact, I don't even think those cases have ever been cited by anybody else to my knowledge. Well, that's not an encouraging sign. Well, they haven't been cited either pro or con, Your Honor. I mean, look, this is a rather rare beast that we're talking about. I don't know how many TIF cases you get up here, but it can't be more than one or two a year. One is too many. Yeah. Mr. Marsden, I understand your argument to be that what the municipality said in their ordinance doesn't really make any difference, because they did specify the levy year that was to be used for establishing the EAB. What I'm saying is that the – I'm almost saying that. What I am saying is that when the statute says, tells the county clerk that he's got to use the most recently ascertained EAB, and if the municipality says, we're designating this year or use that year, and what the municipality says doesn't reflect the facts of what the ascertained, the most recently ascertained EAB is, then I think the county clerk has to follow the statute. So the statute trumps the ordinance. I think that's right. Yeah. Okay. Well, I was going to talk a little bit about this laches thing on the counterclaim, but I think Justice Steigman has already led me into what I was going to say on that point. The problem you have, and I've done a lot of TIF work, so has Mr. Teplitz. The problem you have is you're standing in front of a joint review board. You have the city there. You have the developer there. You have the developer's consultant. There's – you know, they walk through all the blighting factors. One of these TIF studies normally costs $30,000, $40,000 maybe for a TIF study, and unless there's an opportunity for taxing districts later to challenge these TIF studies, what you would be saying is that, hey, every time there's a joint review board, there's some kind of obligation on the part of the county to get a second opinion then and there, and I don't think that's correct. These joint review boards, they're convened. They meet. Boom, boom, boom. The developer and the consultant make their spiel. There's a motion made, and it seems to me that if the representations made by the developer's consultant are not true, not accurate – I'm not saying there's fraud going on here. I'm saying there's inaccuracy going on. I don't see how the taxing bodies can later be foreclosed from challenging the validity of the TIF. As an affirmative defense, or as a counterclaim, brought in a case against the taxing body because they're simply – they were lacking the element of knowledge. They didn't know that there was an issue with this TIF district. I mean, there are other issues in the case about mandamus and whether the right is clear, and mandamus is not issued in an unclear case. The law there is clear. There isn't anything new about this case as it relates to that. So I'll just conclude my remarks in that saying I think that this is one of those situations where in order to effectuate the purpose of the TIF Act, it's necessary to allow this retroactive application of the true value of a property, which was under contract when the TIF was formed. Just for my clarification, the amount of taxes for one year is about $25,000. That's what – is at issue here? Well, yes. And is that for each year of the life of the TIF, which was, what, 23 years? Yes, that's correct.  Yes, it is. Okay. Thank you, counsel. Thank you. Good morning. My name is Jack Teplitz. I am special counsel to the city of Decatur and here to talk to you on their behalf. In answer to the question, let me start off that, what happens if it was exempt and revoked in June versus November of 2006, it doesn't change anything because the year that is used for the initially equalized assessed value or the base is the year of the most recently ascertained equalized assessed value. And without going through all the detail in our briefs, it is clear that both Ms. Miller and Mr. Bean admit that the assessed value becomes equalized in the spring of the year following the taxable year. It becomes equalized when the multiplier are applied by the state. Isn't it true that that really isn't the value of the property? Isn't there reference to the fact that it comes up as zero because it's exempt because otherwise a tax bill will be generated if a figure is put in? I don't agree with that, Your Honor. It is zero on the records. Because it's zero? Because it's zero because if you look at the Property Tax Act, the Property Tax Act breaks out exempt property from taxable property at the beginning of the assessment process. So it is zero whether there's a computer problem of how it shows or not. The same thing is the TIF Act, Section 9 in the TIF Act, talks about the taxable property. Ultimately the initial equalized assessed value or the base is the adding up of all the taxable property in the area. And you have to go back to 2005 equalized assessed value to determine what is taxable, the most recently ascertained. Well, in November of 2006, the most recently ascertained is the 2005 EAV with the multipliers applied. Otherwise it's just the assessed value and not the equalized assessed value. Secondly, I'd like to talk about this idea that the county seems to be rewriting the TIF Act. The idea that the city is only entitled to the increment that's generated by the improvements in the particular property. That's not true. It's all increases in assessed value from whatever source that occurs in the TIF district over the life of the district above the base. And there's nothing in the TIF Act that anybody can point to to say that it should be restricted just to what the developer is putting into that particular property. As a matter of policy, though, wasn't Mr. Myers' point a good one? The hypothetical he gave about building worth a million dollars and let's say putting a half million dollars worth of stuff? I would respectfully disagree with Mr. Myers because many times in creating a TIF you may be using the increment from one building to help pay for costs of another building. The beautiful thing about TIF is you can tailor your redevelopment costs and understand that it can't be any costs. It's limited to the eligible costs set forth in the Act. For instance, they can't pay for new buildings. They can't reimburse for new buildings, those kinds of things. You can do renovation, but you can also do public improvements. Some TIFs, the primary expenditure of public improvements generated by the increment and the developers attracted because the municipalities made the public improvements. So in answer to your question, it's an individual thing for each project. Sometimes the renovations are so expensive you can't afford to do it just on the increment generated by that particular building. You need everything that happens. You also capture the increment based on the fact that because you did this one improvement, the rest of the property benefits, even if they're not renovated in their assessed value, rises because it's a better area as a result. The appellants would have you believe that, and they said in their brief, that we're gaming the system. We're sticking in our pockets to the detriment of taxing bodies, those incremental revenues that are not due to redevelopment of the property. Our argument would be this is a state-wide system. The Supreme Court has found that TIF is not just a local thing for municipalities. It's a state-wide system to provide increases in assessed value, to lower the unemployment rate, and for the benefit of the public good. And as a state-wide system, the municipality is not only acting as a municipality, it's acting as an agency of the state. And what the clerk has done is he's taken it upon himself to correct the system by himself. When the statute, Section 9, tells him that he's doing a very specific ministerial action, he's told to collect the data, which is on the records at the assessor's office, add it up, and certify that this is the correct data. He's not asked to do anything else. He's not part of the TIF process, except to do that one specific duty. And yet he's determined now to take this state-wide system and say, I don't like the fact that they're gaming the system by getting extra increment here or there, and therefore I'm going to be the sole arbiter of changing the law, because there's nothing in the law that supports his position. I guess the city, and I thought long and hard about using this term, but it really takes great umbrage to the accusation that somehow the city's gaming the system. What they've done is they've taken a run-down shopping center, and they were thankful to find a developer to do something with it, and it had been run down for a great length of time. And they did a TIF district so that this center could turn around and be a productive piece of property in the community. It wasn't gaming the system. It was using the statute exactly the way it was designed to be used. Let me ask you something about that. Sure. Because I understand that Rural King looked at this property, the old Kmart property, in 2003. They decided they're not going to buy it. The church ends up buying it. And then there's some kind of exchange agreement between Lear, the church, and IP, and then lo and behold, Rural King ends up getting that very property it looked at in 2003, but now the EAD is zero. The reason that you would get somebody like Rural King who looked at it and wouldn't buy it, in fact, nobody would buy it except the church, the reason that they were able to go back in is because their cost of occupancy was lowered because of the assistance in the redevelopment of the property. Many times what happens, we see it around here, we see vacant buildings just sitting, and why isn't the private sector going in? Well, to get an old enough building, and you look at not only the acquisition cost, but the cost of renovation, and you look at that, the occupancy cost of the tenant or the owner, and it's above what they can do in the marketplace. So they're not going to do it. So what TIF does is help lower the cost of occupancy and renovation so that they're getting in there at a reasonable cost in order to do it. It had nothing to do with the process. Nobody designed a scheme that somehow the church was going to sneak in there. At the time the church bought it, everybody thought that that church was renovating. In fact, the church spent a large amount of time and effort in renovating the property before that decision was made. Well, I get everything you're saying, but if World King had actually purchased it in 2003, and then the TIF was formed, the EAD would be different than it was after this other agreement with Lear and the exchange agreement. It would have been higher. I agree with that. But I shouldn't read anything into that. I don't think you can. I don't believe that's an issue. I don't think you can read anything into it because there's nothing, no evidence whatsoever to say this was part of a larger scheme to reduce the assessed value for purposes of that. In fact, if anything, I think it's the opposite, which is the private sector wasn't going to go in to buy this building. World King refused to buy it. And only because their occupancy cost got lower did they make the decision to go in. So in effect, it's really, to me, it's the county that's gaming the system here. Yes, I find my ten minutes are up. Thank you, John. May it please the Court, Counsel, my name is Chris Ellis. I'm here on behalf of the Plain Ignorance Action IP Plaza, LLC, the developer of this property that we're talking about. What I'd like to do with the panel's okay, with your permission, is take you to our brief and point to a couple of the documents in the appendix that I think really tell the story about what happened here. If I could take you to A113 in our brief and as part of our supplemental appendix. What was that, Counsel? A113?  Thank you. If you're all there, this is the ordinance that was actually passed by the City of Decatur to create the Tax Increment Financing District. If you flip a few pages to A117, you'll see the legal description for the Glad Tidings Tract. Now, if you look in the middle of that page, it shows that the 2005 EAV, for this tract, is zero exempt. This document here was used throughout the whole process in forming this TIF in all areas through the development of the project. And that zero number, if I can take you to one more place in the appendix, comes from A1 at the start of the appendix. And A1 is the Macon County parcel data sheet for 2005. If you will note there, the equalized assessed value for 2005 for this parcel is clearly noted as zero. The county assessor, Ms. Miller, when I deposed her, she testified that if a property is exempt for an entire year, the EAV for that property is zero. So it is that zero on the parcel data sheet that was used to create the form that was attached to Beth's Rules Report, the GRB report, the ordinance, and every other document that the developer saw and relied upon in entering into this TIF agreement. Mr. Myers has argued, however, that the statute trumps the ordinance. And, Your Honor, luckily we don't have to get into that argument here. Because under the statute, it says that the municipality shall tell the clerk what year to use it. And here the municipality told the clerk to use 2005. The statute also says that the clerk shall use the most recently ascertained assessed value. Thankfully for us, that is also 2005. That is in the record, that is in the depositions of Ms. Miller. Mr. Bean said, even has the exemption been revoked in 06, that does not become an equalized assessed value until 2007 when the equalizers are added. So what happened in 06 is really a red herring. It means nothing to what we're talking about today. What we're talking about today is when was the last time that property had an equalized assessed value, the most recent. And in the 06 timeframe, that was 2005, that number was zero. That is the number the county gave to the developer, the city, the expert doing the blighted analysis and said, this is the EAB for this parcel. The most recently ascertained EAB is zero. That's what was used. That set off the triggering of events that led us here today. Now, we've heard a lot of talk about there's a contract in place already to buy this property. Well, the affidavit of Tony Romano, the developer, and just for you all up there, that's at A1110 of our appendix is the affidavit. And he states in there that the purchase of the Gladtide Hills parcel would not have taken place as it was contingent upon the adoption of the ordinance. So it is true that in June a contract had been entered between the developer and the church for this property swap that we're talking about. But that was contingent upon this TIF ordinance passing. Now, why is that? And I'm going to answer some of the questions you talked about. I live right by this property. I remember when it was a Kmart. Kmart closed, a lot of jobs went away, the property went in bad shape. It was auctioned. No private developer bought it. A church bought it. When a church buys property, that's good for the parishioners, but it's bad for the tax enrolls. It was not a property a developer had an interest in. So this agreement with Mr. Romano and IP Plaza was contingent upon this TIF ordinance because he realized he could only make that property work if he had the advantages of the TIF ordinance. There was no backdoor deal. There was no side agreements. There's nothing. It was explored. Mr. Myers asked Mr. Romano, did you have a deal with the school district? Did you have a deal with AIMI? The answer was no. I asked the county, do you have any evidence that there's some shady operation taking place that troubles you so much about this TIF? And the answer was no. We have no evidence of that. Rural King looked at the property. Everyone acknowledges that. Rural King made a business decision. We can't do anything with this property. That was a bad thing for our economy. The church bought the property. That was a bad thing. Then we had a developer who has good ideas. He said, I've got a property away from commercial developments that's large that this church can go to. If I get some help, I can turn this commercial property into something that can create jobs and money and eventually taxing revenue for the school district. Because what we all have to remember here, if the church had kept the property, there would have never been any real estate taxes ever paid on that property. Ever. It would be exempt. Now there will be real estate taxes paid, paid back to the TIF to reimburse the developer. When that's gone, the taxing districts will incur a benefit from the developer. There are a lot of issues. All of them are contained in the brief. I'm happy to answer any other questions that anybody might have. It's been covered by both counsel. When will it become taxable? It will become. I want to make sure I understand the question correctly. When will real estate taxes on that property that originally had, from your perspective, assessed value of zero, when will those start being paid? Okay, they are being paid now. They're paid every year by the developer. They go in the TIF fund and then they'll be refunded to the developer. They will start being paid to the taxing districts at the end of the TIF or at such time as the developer has been made whole. So the developer has certain costs he can recover under the redevelopment agreement. Once those are paid in full, then 100% of the taxes go to the taxing districts. So it is, we're five years into it now. It could be another 15 years. It could be another 10. I don't know. What I do know is if the church still owns the property, the school district my kids go to and everybody else wouldn't be paying any money anyway. So there's no harm to the county or anybody. This is on Mount Zion Road? Yes, sir. Where is that? Is that southeast, Decatur? That would be, I'm thinking of Mount Zion, yes. That's right, southeast. And there is a McDonald's, there's a Walmart by it. And, you know, what's interesting about the property, it was a Kmart for many years until the bankruptcy. I think had the property been in better shape and, you know, there was asbestos found in the property, there's a lot of issues, it's in a good location, which I think was what caused everybody so much trouble with the church buying the property. And they really wanted it to be a part of a development and not part of a church. Where did the church move to? The church moved to the old Ameren IP building. Where's that? That is across from Nelson Park, kind of hidden back in some trees and such, off of William Drive, I think. So if there are no further questions, I've been told by one of my senior lawyers, sit down any chance you get. So I will take that advice. Sound advice. Thank you, Counsel. Thank you, Jim. Your bottle, Mr. Myers? Real quick, hopefully quick. Two things. First of all, I am not suggesting that this city and this developer are gaming the system. That's not what I said in the brief. I'm not intending to insult anybody in the Decatur City Council. What the brief says is that the rollback cases say that there are opportunities to game the system, and they're trying to close that opportunity. And that's what I'm saying. We need to close these opportunities. I'm not saying that these folks here are gaming anything. Secondly, this argument about, well, you know, what used to be a non-taxable property is now a taxable property. It's returned to the tax rolls. It's a red herring because, as we just heard, what happened is the church exchanged this property for another property that belonged to the developer, the old Ameron Sips building, and that property went off the tax rolls. So, you know, we've got one going on and one going off. So I don't think that argument is really germane to the question here of what the clerk is supposed to do when he's presented with the rather unique facts of this situation. Thank you. Thank you. We'll take the matter under advice.